**Dennis L. KELSEY, Plaintiff,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

**Civ. No. L 87–33.**

United States District Court,
N.D. Indiana,
Hammond Division.

March 15, 1988.

Frederick J. Daley and Dorie Budlow, Chicago, Ill., Ralph L. Robinson, Lafayette, Ind., for plaintiff.

Christina McKee, Fort Wayne, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The court now considers an action brought pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for judicial review of the Secretary's final decision denying the plaintiff's application for a pe-

riod of disability and disability insurance benefits as provided by Title II, §§ 216(i) and 223 of the Social Security Act, 42 U.S. C. § 416(i) and 423.

The plaintiff filed his application for disability benefits on July 31, 1984, alleging an onset date of January 4, 1983. His application was denied initially and again on reconsideration. A hearing was held on February 26, 1986, before Administrative Law Judge (ALJ) Castelli, who issued a written decision on June 26, 1986. Upon request for reconsideration, the Appeals Council adopted the ALJ's decision whereby it became the final decision of the Secretary on January 8, 1987. On March 1, 1987, the plaintiff filed a timely appeal to this court.

Mr. Kelsey asserts that the Secretary has failed to show that despite limitations, he can perform jobs existing in significant numbers in the national economy. More particularly, the plaintiff alleges error in the ALJ's finding that he can perform a full range of sedentary work. By counsel, Mr. Kelsey argues additionally that his disability meets the requirements of parts 1, 2(e), (f) and 3 of 12.07, subd. A of the Listing of Impairments, which describe somataform disorders. Finally, the plaintiff argues that the ALJ erred in his assessment and treatment of pain.

The ALJ's decision contained the following findings:

1. The claimant met the disability insured status requirements of the Act on January 4, 1983, the date the claimant stated he became unable to work, and continues to meet them March 31, 1984.

2. The claimant has not engaged in substantial gainful activity since January 4, 1983.

3. From January 4, 1983, through at least January 23, 1984, the claimant's herniated nucleus pulposus met the requisites of Section 1.0–5 C, Appendix 1, Subpart P, Regulations No. 4, and precluded him from working for at least twelve continuous months (20 CFR 404.1525).

4. After January 23, 1984, the medical evidence establishes that the claimant has severe herniated nucleus pulposus, status post chemonucleomysis, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's subjective complaints with regard to pain and restricted or limited daily activities from January 4, 1983, through and including March 7, 1985, are supported by the objective medical evidence and are credible, and from January 4, 1983, through and including March 7, 1985, but not thereafter, he did not have the residual functional capacity to perform any type of substantial gainful activity.

6. After March 7, 1985, the claimant has the residual functional capacity to perform the physical exertion requirements of work except for lifting or carrying more than 20 pounds and walking or standing for extended periods of time. There are no nonexertional limitations (20 CFR 404.1545).

7. The claimant is unable to perform his past relevant work as a construction worker.

8. After March 7, 1985, the claimant has the residual functional capacity to perform the full range of sedentary work (20 CFR 404.1567).

9. The claimant is forty-three years old, which is defined as a younger individual (20 CFR 404.1563).

10. The claimant has a tenth grade or limited education (20 CFR 404.1564).

11. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

12. Section 404.1569 of Regulations No. 4 and Table No. 1 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity after March 7, 1985, his age,

education, and work experience, he is not disabled.

13. The claimant was under a "disability," as defined in the Social Security Act, from January 4, 1983, through and including March 7, 1985, but not thereafter.

The parties to this action have filed cross-motions for summary judgment and all issues have been fully briefed. Therefore, the matter is ripe for ruling. The central issue before the court is whether substantial evidence supports the ALJ's finding that Mr. Kelsey has the residual functional capacity to perform sedentary work after March 7, 1985.

### I.

The Social Security Act provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (1983); *Walker v. Bowen,* 834 F.2d 635, 639 (7th Cir.1987); *Burnett v. Bowen,* 830 F.2d 731, 734 (7th Cir.1987). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); see also *Sears v. Bowen,* 840 F.2d 394, 398 (7th Cir.1988); *Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986).

The court's review for substantiality of evidence will take into account "whatever in the record fairly detracts from its weight." *Sears v. Bowen,* at 398 (7th Cir. Jan. 22, 1988), *quoting Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986). Included in the evaluation will be consideration of the clinical findings and diagnoses of treating and examining physicians, subjective evidence of pain and disability indicated by the plaintiff and observed by others, and the plaintiff's educational background, work history, and present age. *Bauzo* at 923, citing *Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir.1982). The court will require that the decision of the ALJ be based on a "fair and impartial presentation of all the medical evidence that is credible, supported by clinical findings, and relevant to the particular issue." *Bauzo* at 923, quoting *Zalewski v. Heckler,* 760 F.2d 160, 163 (7th Cir.1985).

The law does not require that the ALJ discuss every piece of evidence, but rather, that he or she articulate the reasoning in a manner sufficient to allow meaningful review. *Walker v. Bowen,* 834 F.2d 635 (7th Cir.1987). Although the court has required the ALJ to make specific findings when evidence supportive of the claimant is rejected, *e.g., Garfield v. Schweiker,* 732 F.2d 605, 609–610 (7th Cir.1984), that requirement will be applied only where the evidence that was omitted went uncontradicted. *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985). Uncontradicted evidence supportive of the claimant's position must be addressed at a minimal level of articulation in the ALJ's assessment of evidence, where considerable evidence has been presented by the plaintiff. *Id.; Burnett v. Bowen,* 830 F.2d 731, 735 (7th Cir. 1987).

Having reviewed the entire record and all evidence contained in it, the court is obliged to accept the ALJ's findings if they are supported by substantial evidence. *Meredith v. Bowen,* 833 F.2d 650, 653 (7th Cir.1987); *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir.1987) (per curiam). Although substantial evidence means more than a scintilla, *Richardson* 402 U.S. at 401, 91 S.Ct. at 1427, it is "something less than the weight of the evidence." *Delgado v. Bowen,* 782 F.2d 79 (7th Cir.1986), quoting *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Thus, the question presented for review is not whether the claimant is disabled, but rather whether the ALJ's finding of non-disability is supported by substantial evidence in the record. *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987). This court does not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Meredith v. Bowen,* 833 F.2d 650, 653 (7th Cir. 1987); *Garfield v. Schweiker,* 732 F.2d 605,

610 (7th Cir.1984). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, it is for the Secretary or the Secretary's designate, to resolve the conflict. *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); *Delgado v. Bowen,* 782 F.2d 79, 82–83 (7th Cir.1986); *Stephens v. Heckler,* 766 F.2d 284, 287–88 (7th Cir.1985).

In determining whether or not a claimant is disabled, the Secretary has adopted a five-step sequential evaluation process, which has been summarized as the following inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work in the national economy? An affirmative answer leads either to the next step, or on steps (3) and (5) to a finding that the claimant is disabled. A negative answer at any point other than at step (3) will lead to a finding that the claimant is not disabled. 20 C.F.R. § 404.1520; *Veal v. Bowen,* 833 F.2d 693, 695 n. 2 (7th Cir. 1987).

This case was decided at step (5) of the procedural process. See, 20 C.F.R. §§ 404.-1520(e), 416.920(e); *Walker v. Bowen,* 834 F.2d 635 (7th Cir.1987); *Burnett v. Bowen,* 830 F.2d 731 (7th Cir.1987); *Tom v. Heckler,* 779 F.2d 1250 (7th Cir.1985). At this step of the process, the decision must take into account the claimant's residual functional capacity, age, education, and work experience, in order to determine whether he or she is capable of performing any other kind of substantial gainful employment. 20 C.F.R. §§ 404.1520(f), 426.920(f). Here the ALJ found that after March 7, 1985, the plaintiff could perform the full range of sedentary work, including all exertional requirements of work except lifting or carrying more than 20 pounds and walking or standing for extended periods of time. Having found no nonexertional limitations, the ALJ applied the Grid and found the plaintiff not disabled.

20 C.F.R. Section 416.967 provides:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

 In this case the decision made use of "the Grid", a chart that classifies the claimant as disabled or not disabled, on the basis of residual functional capacity, age, education, and work experience. See, *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); Appendix 2, Subpart P, Part 404, Chapter III, 20 C.F.R. §§ 200.00–204.00 (1987). In appropriate cases the Grid alone will constitute substantial evidence sufficient to affirm the Secretary. *Walker* at 640, citing *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Use of the Grid may be inappropriate, however, where a claimant suffers from severe non-exertional impairments, including pain. *Walker* at 640, citing *Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Even where use of the Grid is inappropriate, it may be used as a "framework", along with other evidence such as the input of a vocational expert, to determine the effect of a non-exertional impairment on the job base. *Warmoth v. Bowen,* 798 F.2d 1109, 1112 (7th Cir.1986). See also, 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e)(2)(1985). The ultimate test is whether the record contains "reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Warmoth* at 1112, citing *Nelson v. Secretary of Health and Human Services,* 770 F.2d 682, 684–85 (7th Cir.1985) (per curiam).

## II.

The record indicates that Mr. Kelsey was born on October 2, 1942, and was, at the time of his hearing, forty-three years of

age with a tenth grade education. His prior work experience for the relevant time period included bricklaying and operating heavy equipment in the construction business.

In January of 1983, a large Caterpillar engine fell on Mr. Kelsey. He apparently worked the remainder of the day and about a week thereafter, but at some point saw his family doctor due to a sharp pain in his right groin, which he also experienced at the time of the accident. He was referred to the Arnett Clinic, where a Dr. Perez referred him to Dr. McPherson, who in turn referred the claimant to Dr. Jaap Lind, who admitted Mr. Kelsey to Lafayette Home Hospital on March 7, 1983. He underwent a series of tests including a myelogram to determine the source of his pain, which now was located primarily in the lower back. In general the doctors could find no abnormality to explain the plaintiff's symptoms.

In July of 1983, Mr. Kelsey was admitted to St. Elizabeth Hospital for complaints of low back pain and numbness of the lower extremities. He underwent a myelogram and a neurological examination as part of the testing. The impression from the myelogram on July 18, 1983, was that it was "probably within normal limits." The left root sleeve at L5–S1 was considered inconstant. The report noted "some residual media in the canal both inside-and-outside the sheaths" from a previous study. There was a slight suggestion of blunting at L5–S1 on the frontal view, and slight narrowing at L–2 and L–3, but the opaque projections were favorable. The evidence later established that Mr. Kelsey experienced adverse reactions to this myelogram.

The plaintiff returned to St. Elizabeth's in August and was scheduled for surgery, but it was postponed for further neurological investigation. By this time the plaintiff was experiencing headaches and diplopia, which he pinpointed as having begun after the July myelogram. A brain scan on August 8, 1983, resulted in a normal reading. An electroencephalogram was also normal, and a CT scan was negative.

On August 15, 1983, Dr. Ralston, an opthalmologist reported, with respect to Mr. Kelsey's complaint about double vision, that the test for muscle balance showed weakness of the right lateral rectus, or right sixth nerve palsy. The doctor stated:

"During the two times that I saw him, I was struck by the fact that his responses seemed to be consistent with a hysterical response. Nevertheless, he does demonstrate a partial right sixth nerve palsy ... he stated that the eyes were examined prior to the myelogram and there was no palsy at that time. I must conclude that the problem apparently did follow the myelogram and may well be as a result of it."

Dr. Ralston believed at the time that glasses might help, and the problem would resolve itself.

On September 13, 1983, Dr. Keplinger, a neurologist opined that he saw no neurological contraindication to prevent going ahead with back surgery. On September 25, 1983, Dr. John Fournier, an opthamologist, found that Mr. Kelsey's complaints of double vision were objectively confirmed with red glass testing, although he was able to fuse with effort. Dr. Fournier opined that Mr. Kelsey had experienced an "untoward adverse reaction to myelogram dye", consistent with reports in literature. His impression described the condition as "acquired persitent [sic] chronic horizontal diplopia (double vision) ... back injury-ruptured disc-related to work injury ... (and) chronic low back pain." In a report dated October 1, 1983, Dr. Fournier concluded that Mr. Kelsey suffered from "abnormal lumbar and lower extremities", confirmed by a thermographic evaluation which correlated with Mr. Kelsey's subjective areas of discomfort and pain, and which was "consistent with lumbar nerve irritation at L5–S1 (radiculopathy)."

In a letter dated November 7, 1983, Dr. Josua Speigel, a neurological surgeon, reported that Mr. Kelsey came to his office with complaints of constant headaches behind the eyes radiating to the back of his head, occasional dizziness, constant pain in the back of the neck, pain in the left upper

extremity that would come and go, numbness of the left upper extremity including the hands and fingers, constant pain in the low back, and numbness of the left lower extremity. He walked bent over with a "shuffling uncertain gait sparing the left lower extremity."

Upon a detailed neurological, cervical spine and lumbosacral spine examination, as well as the medical record, history and a physical examination, Dr. Speigel concluded that Mr. Kelsey received severe trauma to the right inguinal region at the time of the January, 1983, incident, after which he developed low back pain, corroborated by a CT scan showing the possibility of ruptured disc at L5–S1 on the left side. Dr. Speigel believed that the myelogram involved a needle having touched a "filament of the cauda equina", which caused the negative effects complained of by Mr. Kelsey. Dr. Spiegel could not fully explain the attacks of double vision.

In the doctor's opinion there was no question that Mr. Kelsey suffered from severe low back difficulty radiating into the left lower extremity. He stated that "diminished sensation and the almost absent left ankle jerk along with a positive Laseque sign were strongly indicative of a mass lesion at the L5–S1 on the left side pressing on the spinal nerve and causing the symptoms and signs." In a supplemental letter, Dr. Speigel stated that he would be very reluctant to operate on Mr. Kelsey, but in a later letter, with input from Dr. Fournier, he agreed to surgical exploration.

On January 16, 1984, the plaintiff was admitted to Michael Reese Hospital for chemonucleomysis under the care of Drs. Ferguson, Sloan and Luken. He was discharged on January 25, 1984. Post-surgical reports indicated that Mr. Kelsey came out of the procedure alert, attentive, and moving all lower extremity groups readily to command. It was noted that during the procedure, "the disc space offered little resistance to the injection of the dye, suggesting abnormality of the structure."

In April of 1984, Mr. Kelsey again was treated at Michael Reese Hospital. Reports from that time indicated a radiographically normal chest. Tomography revealed a decrease in the size of an extradural defect on the right side at L4–L5, but at the L5–S1 there was a moderate degree of generalized centrally bulging disc, which appeared to be slightly larger than in the earlier study. There was noted several droplets of the pantopaque in the subarachnoid space remaining from a previous myelography. Comparing the lumbosacral spine with tests from January 18, 1984, there was found a disc space narrowing at L4–L5. In a letter dated June 18, 1984, Dr. Luken reported that Mr. Kelsey's physical examination remained the same as Dr. Speigel's initial examination. Dr. Luken stated that EMG examinations and somatosensory evoked response testing "did not reveal clear evidence for either peripheral nerve root, or spinal cord dysfunction," quoting Dr. Morris Fisher, a neurophysiologist.

An assessment by Dr. John Ambrosia in August of 1984 indicated "chronic low back pain with weakness of the extensor hallucis longus on the left side, [which] ... may be an indication of an L5 radiculopathy." He reported a spinal range of motion of 30 degrees forward flexion, 0 degrees of extension and 5 degrees of right and left side bending. Dr. Ambrosia stated that the plaintiff "had severe pain past any of these extremities ...." The ALJ summarily interpreted this report as "consistent with the claimant's ability to perform sedentary work activity."

In reviewing the evidence, the ALJ also referred to a report dated March 7, 1985, from a consultation with Dr. John Mealey, a neurological surgeon, which was received after the administrative hearing. The ALJ provided a thorough review of that evaluation which will not be repeated here. Dr. Mealey concluded that the plaintiff suffers from a moderately severe mechanical low back problem and that he demonstrates considerable psychological overlay. He felt that Mr. Kelsey had probably acquired spinal stenosis at the L4–L5 level after chemonucleolysis. He did not feel that surgical intervention was indicated, and opined that the claimant had reached a stable

quiescent condition, having not undergone specific treatment since his hospitalization of April, 1984. Dr. Mealey believed that Mr. Kelsey has a permanent partial impairment of 15 percent of the whole person, with a possibility of additional impairment related to occular complaints.

Without any specific articulation, the ALJ's report made passing reference to additional evidence submitted after the hearing as follows:

"... Exhibits 57, 58 and 59 report findings supporting the existence of a severe impairment with chronic pain. However, the Exhibits established that as of March 7, 1985, [Mr. Kelsey's] ... condition stablized (sic) and he regained the ability to perform at least sedentary work activity."

To support this conclusion, the ALJ focused on the plaintiff's minimal medication and his activities.

The ALJ described Mr. Kelsey's daily activities as involving "trying to do woodworking for 20 to 45 minutes at a time," after which time he must "lie down and rest to relieve the pressure and resultant pain. He is able to ride a lawnmower for 15 to 20 minutes and walk behind a self-propelled mower for up to one-half hour." Reviewing the report of Dr. Mealey, the ALJ indicated that Mr. Kelsey "described a very sedentary lifestyle but he helped around the house with light housework. He drove an estimated three or six miles a month, did not shop, and read Mechanics Illustrated. He made some doll furniture and other woodworking chores and slept four hours during the day as a nap."

Without benefit of a vocational expert, the ALJ relied on the opinion of Dr. Lindseth, a medical advisor who appeared at Mr. Kelsey's hearing at the request of the administration. Apparently on the basis of Dr. Ambrosia's examination on August 22, 1984, Dr. Lindseth believed that the plaintiff would be capable of performing sedentary work, barring any additional evidence which would indicate otherwise.

A report dated May 2, 1985 by Dr. Leo Cooper indicated that without benefit of x-rays, he viewed the plaintiff as "obvious-ly disabled and impaired" and estimated him to be "partially permanently impaired in the amount of 30% of a man as a whole or 150 weeks." A May 7, 1985 report by Dr. William Fischer opined that Mr. Kelsey has "residual symptoms associated with inflammation in the spinal canal space (arachnoiditis)." A report dated September 3, 1985, by Dr. George Clark indicated that the plaintiff suffers from retrobulbar neuritis due to chronic arachnoiditis involving the right eye and resulting in a grand total of 30% loss of vision in the right eye. The record also suggests that the plaintiff is deaf in one ear.

At the hearing plaintiff's counsel argued that the evidence indicates, in addition, that Mr. Kelsey may have a somatoform disorder. Counsel requested additional testing to explore this possibility. To support this theory counsel submitted the reports of Drs. Irving Sherman, certified in neurology and psychiatry and Dr. Darrell Snyder, a clinical psychologist. The Appeals Counsel refused to consider these reports because they pertained to examinations conducted after the ALJ's decision.

### III.

■ Having carefully examined the entire record, the court concludes that this case must be remanded for a lack of substantial evidence that the plaintiff can do a full range of sedentary work after March 7, 1985.

■ The court notes a lack of suggestion in this record that the plaintiff is less than credible, nor did the ALJ so find. He based his decision on an inference which he drew from the plaintiff's activities and from the amount and frequency of the plaintiff's medication, which apparently had caused addiction, had been ineffective, and had been cut back, on the advice of a doctor. Neither the evidence related to medication, nor the activities described by the plaintiff, constitute substantial support for the ALJ's inference. Moreover, the ALJ's finding that there are no non-exertional impairments is contrary to the evidence. The court finds that on the basis of

this record taken as a whole, the ALJ erred in applying the Grid without consideration of the effects of combined impairments on the plaintiff's ability to perform sedentary work.

At the fifth step of the decision-making process, the burden shifts to the Secretary to demonstrate that the plaintiff retains sufficient residual functional capacity to perform other work available in the national economy. *Walker* at 640. This determination must take into account the plaintiff's combined impairments, both exertional and non-exertional, including pain. *Id.* This record indicates that the plaintiff not only suffers from severe pain, but that he is deaf in one ear, is markedly limited in motion, has a 30% loss of vision, and suffers from moderately severe lower back problems and nervousness. There is also some suggestion that along with the physical problems, psychological problems have developed, although that theory remains at this point not fully explored.

At first blush, the facts of this case appear similar to those of *Walker*, in which the Court of Appeals for the Seventh Circuit upheld the decision of the Secretary. That case is, however, different. The ALJ there found the claimant's account of pain not credible on the basis of inconsistencies in the record. In this case the plaintiff has not been found to be lacking in credibility. Secondly, in *Walker* the allegations of pain were not borne out by objective medical evidence, and three doctors who examined the claimant found him capable of sedentary work. That evidence is not to be found here. The ALJ here stated rather obliquely that the report of Dr. Ambrosia "was consistent with the ... ability to perform sedentary work activity."

This conclusory statement falls short of adequate articulation, and the record does not contain substantial evidence that the claimant has retained the ability to perform the full range of sedentary work on a sustained basis. On remand the ALJ should take into account the effects of the plaintiff's impairments, both exertional and non-exertional, on his ability to perform sedentary work on a sustained basis. The facts of this case suggest the need for more detailed vocational information, as opposed to a routine application of the Grid.

The facts of this case are also different than those in *Cummins v. Schweiker* 670 F.2d 81 (7th Cir.1982), which affirmed the Secretary. In *Cummins*, the ALJ specifically found that the plaintiff's blindness in one eye had not interfered with previous work and would not interfere with sedentary work of which he was exertionally capable. The medical evidence was disputed, and the plaintiff's claims of severe neurological disorder, severe intractable pain, and extremely limited mobility were specifically found not credible.

In considering the plaintiff's subjective testimony of pain the ALJ need not make specific findings with respect to credibility. It is sufficient if he or she explicitly weighed the complaints in the narrative portion of the decision and specifically found that the complaints were not supported by the evidence. *McNeil v. Califano*, 614 F.2d 142, 144–45 (7th Cir.1980). The plaintiff's kind and quantity of medication and activities from his or her daily life, taken with subjective testimony, and medical and clinical evidence, are valid considerations. *Id.* Remand for further consideration might be appropriate, however, where it is unclear from the decision whether the ALJ considered subjective complaints, for example, where the decision contains neither a specific credibility finding, nor any statements in the decision from which a court might conclude that complaints were rejected. *Id.*, citing *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).

Here, the plaintiff has produced evidence of conditions that could reasonably be expected to produce his pain. See, 42 U.S.C. § 423(d)(5)(A); *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir.1987); *Sparks v. Bowen*, 807 F.2d 616 (7th Cir.1986); *Baker v. Bowen*, 680 F.Supp. 304 (N.D.Ind.1988).

On the facts of this case and the record now before the court, the ALJ erred in applying the Grid without considering the effects of combined impairments on the plaintiff's ability to perform the full range

of sedentary work on a sustained basis. The finding of disability through and including March 7, 1985, is supported by substantial evidence and is AFFIRMED. The case is otherwise REMANDED for a new hearing before a different ALJ, consideration of any and all relevant evidence, and fresh findings consistent with this opinion. SO ORDERED.